# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  Larry Buonomo, Assistant General Counsel
     Key Safety Systems, Inc.
     2025 HARMON RD
     AUBURN HILLS, MI 48326-1776

SOP Transmittal # **544686708**

Entity Served:  KEY SAFETY SYSTEMS, INC.  (Domestic State: DELAWARE)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of MICHIGAN on this 11 day of September, 2023. The following is a summary of the document(s) received:

1.  **Title of Action:**  ROMEO MAGANA, VICTORIA and EDWARD MAGANA vs. THE GOODYEAR TIRE & RUBBER COMPANY

2.  **Document(s) Served:**  Other: --

3.  **Court of Jurisdiction/Case Number:** None Specified
    Case # D202CV202305703

4.  **Amount Claimed, if any:**  N/A

5.  **Method of Service:**  Traceable Mail

6.  **Date of Receipt:**  09/11/2023

7.  **Appearance/Answer Date:**  None Specified

8.  **Received From:**  None Specified

9.  **Carrier Airbill #**

10. **Call Made to:** Not required

11.  **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  Larry Buonomo  larry.buonomo@joysonsafety.com

Email Notification,  Anita Benavides  anita.benavides@joysonsafety.com

Email Notification,  Natalie Bilous  natalie.bilous@joysonsafety.com

**Registered Agent: NATIONAL REGISTERED AGENTS, INC**          CopiesTo:

**888-579-0286 - Telephone**

The information contained in this Summary Transmittal Form is provided by NRAI for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. NRAI disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

ORIGINAL

EXHIBIT
A

FLAT RATE ENVELOPE
POSTAGE REQUIRED

# UNITED STATES POSTAL SERVICE ®

# PRIORITY ® MAIL

...ted delivery date specified for domestic use.

...stic shipments include $100 of insurance (restrictions apply).*

**Tracking®** service included for domestic and many international destinations.

...d International insurance.**

...used internationally, a customs declaration form is required.

...does not cover certain items. For details regarding claims exclusions see the
Mail Manual at *http://pe.usps.com.*

...national Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

# T RATE ENVELOPE
...TE ■ ANY WEIGHT

# ...CKED ■ INSURED



To schedule free Package Pickup,
scan the QR code.

PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

USPS.COM/PICKUP

---



## UNITED STATES POSTAL SERVICE ® Click-N-Ship®



usps.com    9410 8036 9930 0163 0952 97 0130 5000 0064 8170
**$13.05**
**US POSTAGE**
Flat Rate Env
Signature
Confirmation            **U.S. POSTAGE PAID**
Click N Ship®

09/08/2023            Mailed from 87112    9867480610040302

## PRIORITY MAIL®

MATTHEW ZAMORA                    Expected Delivery Date: 09/11/23
VALLE, O'CLEIREACHAIN, ZAMORA &
HARRIS                                              **0001**
STE 2
1805 RIO GRANDE BLVD NW
ALBUQUERQUE NM 87104-2672

SIGNATURE REQUIRED                    **C021**



NATIONAL REGISTERED AGENTS, INC
KEY SAFETY SYSTEMS, INC
STE 201
40600 ANN ARBOR RD E
PLYMOUTH MI 48170-4675

### USPS SIGNATURE TRACKING #



9410 8036 9930 0163 0952 97

Electronic Rate Approved #038555749



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.



**VALLE, O'CLEIREACHAIN,**
**ZAMORA & HARRIS**

📞 (505) 888-4357
🖨 (505) 883-5613
📍 1805 Rio Grande Blvd NW, Ste. 2,
   Albuquerque NM 87104
🌐 www.vozhlaw.com

Richard J. Valle
Criostoir O'Cleireachain
Matthew J. Zamora
Andrea D. Harris

September 7, 2023

**<u>Sent Via Priority Mail</u>**

KEY SAFETY SYSTEMS, INC.
c/o National Registered Agents, Inc, as Registered Agent
40600 Ann Arbor Road E. Suite 201
Plymouth, MI 48170

Re:    **<u>Romeo Magana, Victoria Magana, and Edward Magana v. The Goodyear Tire &</u>**
       **<u>Rubber Company; FCA US LLC; Key Safety Systems, INC.; Lithia Motors, INC.</u>**
       **<u>d/b/a Lithia Chrysler Dodge Jeep Ram Fiat of Santa Fe; Lithia CJDSF, INC.; Paige</u>**
       **<u>Pyke, and Martin Pyke</u>**
       **District Court Cause No. D-202-CV-2023-05703**

To Whom it May Concern,

Enclosed please find the following documents in connection with the above-reference matter:

    1) Summons;
    2) Complaint to Recover Damages for Personal Injuries and Loss of Consortium;
    3) Court Annexed Arbitration Certification;

Sincerely,

**VALLE, O'CLEIREACHAIN,**
**ZAMORA & HARRIS**

*/s/ Mariah Chavez-Graham*
Mariah Chavez-Graham
Legal Assistant

Enclosure(s) as noted

## SUMMONS

| | |
|---|---|
| **Court:  Second Judicial District, Bernalillo County, State of New Mexico**<br>**Court Address:    400 Lomas Blvd. NW**<br>                              **Albuquerque, NM 87102**<br>**Phone Number:  (505) 841-7421** | **Case Number: D-202-CV-2023-05703**<br><br>**Judge:  Honorable Elaine P. Lujan** |
| **ROMEO MAGANA, VICTORIA MAGANA and EDWARD MAGANA,**<br>    **Plaintiffs,**<br>**v.**<br><br>**THE GOODYEAR TIRE & RUBBER COMPANY; FCA US LLC;**<br>**KEY SAFETY SYSTEMS, INC.;**<br>**LITHIA MOTORS, INC. d/b/a LITHIA CHRYSLER DODGE JEEP RAM FIAT OF SANTA FE; LITHIA CJDSF, INC.;**<br>**PAIGE PYKE, and MARTIN PYKE,**<br>    **Defendants.** | **TO:**<br><br>**KEY SAFETY SYSTEMS, INC.**<br><br>**c/o National Registered Agents, Inc, as Registered Agent**<br>**40600 Ann Arbor Road E. Suite 201 Plymouth, MI 48170** |
| | |

**TO THE ABOVE- NAMED DEFENDANT(S):** Take notice that

1.      A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

2.      You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA). The Court's address is listed above.

3.      You must file (in person or by mail) your written responses with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4.      If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5.      You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

6.      If you need an interpreter, you must ask for one in writing.

7.      You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Albuquerque                                      8/22/2023

Dated at _____, New Mexico, this _____ day of
August, 2023.

KATINA WATSON
CLERK OF COURT

SECOND JUDICIAL DISTRICT COURT
CLERK OF THE COURT

By: _____
        Deputy Clerk

/s/ Matthew J. Zamora
Signature of Attorney for Plaintiffs
Name:    Matthew J. Zamora
              VALLE, O'CLEIREACHAIN,
              ZAMORA & HARRIS, PC
Address: 1805 Rio Grande Blvd., NW, Ste 2
              Albuquerque, NM 87104
Telephone No.: (505) 888-4357
Fax No.:          (505) 883-5613
Email Address: mz@vozhlaw.com

AND

Name:    C. Tab Turner
              TURNER & ASSOCIATES, P.A.
Address: 4705 Somes Ave., Suite 100
              LittleRock, AR 72116
Telephone No.: (501) 7891-2277
Email Address: tab@tturner.com


THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES
OF CIVIL PROCEDURE FOR DISTRICT COURTS.

**RETURN**

STATE OF _____ )
                                                    )ss.
COUNTY OF _____ )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in _____ County on the _____ day of _____, _____, by delivering a copy of this Summons, Complaint to Recover Damages for Personal Injuries and Loss of Consortium and the Court-Annexed Arbitration Certification, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]  to the defendant _____ *(used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint)*

[ ]  to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA *(used when service is by mail or commercial courier service)*.

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]  to _____, a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____, *(used when the defendant is not presently at place of abode)* and by mailing by first class mail to the defendant at _____ *(insert defendant's last known mailing address)* a copy of the summons and complaint.

[ ]  to _____, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at _____ *(insert defendant's business address)* and by mailing the summons and complaint by first class mail to the defendant at _____ *(insert defendant's last known mailing address)*.

[ ]  to _____, an agent authorized to receive service of process for defendant

_____.

[ ]  to _____, [parent] [guardian] [custodian] [conservator] [guardian *ad litem*] of defendant _____ *(used when defendant is a minor or an incompetent person)*.

[ ]  to _____ *(name of person)*, _____, *(title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision)*.

Fees: _____

_____
Signature of person making service

_____
Title *(if any)*

Subscribed and sworn to before me this _____ day of _____, 20 _____

_____

Judge, Notary or other officer
authorized to administer oaths

_____

Official title

USE NOTES

1.  Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

2.  If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1998; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

FILED
2ND JUDICIAL DISTRICT COURT
Bernalillo County
7/20/2023 3:05 PM
KATINA WATSON
CLERK OF THE COURT
Patricia Serna

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

ROMEO MAGANA, VICTORIA MAGANA,
and EDWARD MAGANA,

       Plaintiffs,

v.                                                                    No. D-202-CV-2023-05703

THE GOODYEAR TIRE & RUBBER COMPANY;
FCA US LLC;
KEY SAFETY SYSTEMS, INC.;
LITHIA MOTORS, INC. d/b/a LITHIA CHRYSLER
DODGE JEEP RAM FIAT OF SANTA FE;
LITHIA CJDSF, INC.;
PAIGE PYKE, and MARTIN PYKE,

       Defendants.

---

## COMPLAINT TO RECOVER DAMAGES FOR
## PERSONAL INJURIES AND LOSS OF CONSORTIUM

---

### INTRODUCTION

    This is a personal injury suit involving product liability, negligence and breach of warranty claims arising from a June 13, 2020, accident on I-25 in Socorro County, New Mexico, following an unexpected and catastrophic tire failure. The Plaintiffs seek actual and punitive damages under New Mexico law.

### PARTIES

    1.    Plaintiff Romeo Magana is a citizen and resident of Albuquerque, N.M.  Romeo was the right front passenger in the subject vehicle and suffered catastrophic injuries in the referenced crash.

2.      Plaintiff Victoria Magana is a citizen and resident of Albuquerque, N.M. Victoria is the biological mother of Romeo Magana.

3.      Plaintiff Edward Magana is a citizen and resident of Albuquerque, N.M. Edward is the biological father of Romeo Magana.

4.      Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a foreign corporation whose principal place of business is 200 Innovation Way, Akron, OH 44316. Goodyear's principal place of business in New Mexico is 123 East Macy Street, Suite 101, Santa Fe, NM 87501.

5.      Goodyear designed, manufactured, assembled, and distributed the subject failed tire.

6.      Goodyear is a publicly traded corporation; it has no parent corporation; and the publicly held company, BlackRock, Inc., owns more than 10% of the stock of the Goodyear Tire & Rubber Company.

7.      Goodyear's registered agent for service of process in New Mexico is the Corporation Service Company, 110 E. Broadway Street, Hobbs, N.M. 88240.

8.      Defendant FCA US LLC ("FCA") is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

9.      FCA is not publicly owned, but is wholly-owned by FCA North America Holdings LLC, a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326, and is wholly-owned by FCA Holdco B.V., a company organized under the laws of the Netherlands. FCA Holdco B.V. is wholly-owned by Stellantis N.V. (formerly known as Fiat Chrysler Automobiles N.V.), which is a publicly traded company organized under the laws of the Netherlands.

10.     Defendant FCA is responsible for the design, manufacture, assembly, and distribution of the subject defective truck.[1] FCA may be served with process through its registered agent, Corporation Process Company, 726 E. Michigan, Suite 330, Hobbs, N.M. 88240.

11.     Defendant Lithia Motors, Inc. d/b/a Lithia Chrysler Dodge Jeep Ram FIAT of Santa Fe and/or Lithia Chrysler Jeep Dodge of Santa Fe ("Lithia MI") is an Oregon corporation with a principal place of business at 150 N. Bartlett Street, Medford, OR 97501.

12.     Lithia MI represents itself as a premier automotive retailer in North America, offering a wide selection of vehicles across global carmakers and providing a full suite of financing, leasing, repair, and maintenance options.[2] Lithia MI offers what it describes as a "comprehensive network of locations, e-commerce platforms, and captive finance division".[3] As of December 31, 2022, Lithia MI operated 296 locations representing 48 brands in two countries, across 28 U.S. states and in three Canadian provinces[4].

---

[1]     FCA responsibility flows from Chrysler/Dodge's history. FCA formerly operated as Chrysler Group, LLC. ("CG-LLC"). CG-LLC formerly operated as Chrysler LLC. In 1998, Chrysler merged with Daimler and became Daimler. Chrysler LLC was formed in 2007 and formerly operated as DaimlerChrysler. DaimlerChrysler formerly operated as Chrysler Corporation, which, in 1987, had merged with American Motors Corporation (AMC). AMC had purchased Kaiser Corporation from Kaiser Industries in 1970, which included the sale of Jeep products. Kaiser Industries acquired Willys-Overland in 1953, which included the Jeep name and products. Kaiser marketed Jeep products between 1954 and 1970 when the product line was sold to AMC. On April 30, 2009, Chrysler LLC, later known as "Old Carco LLC", filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code. In April, 2009, Old Carco and Fiat S.p.A. entered into a "Master Transaction Agreement", pursuant to which New Carco Acquisition LLC, an entity formed by Fiat and referred to as Chrysler Group LLC (CG-LLC), agreed to purchase the principal operating assets of Old Carco and to assume certain of Old Carco's liabilities. Litigation was subsequently initiated challenging the foregoing provisions, which had the effect of insulating Chrysler from Product Liability Claims arising from incidents involving the bankrupt's pre-bankruptcy inventory where the sale of the vehicle occurred pre-bankruptcy. On October 29, 2009, during the pendency of the referenced litigation, the parties to the acquisition agreed to amend the Plan so that the purchaser of the assets would now assume, rather than disclaim, non-time-barred Product Liability Claims that "arise from the sale on or prior to the Closing based on accidents that occurred on or after Closing, including negligence claims. The aforementioned sale closed on June 10, 2009, thus making CG-LLC responsible for defects in the subject vehicle. On November 19, 2009, a stipulation and agreed order approving Amendment No. 4 to the MTA was approved and filed. The Amendment represented the assumption of responsibility for pre-bankruptcy vehicles involved in post-bankruptcy crashes, including CG-LLC's assumption of responsibility for defects in the subject vehicle.

[2]     Annual Report (2022).
[3]     Id.
[4]     Id.

13.    The Chair of Lithia MI's Board of Directors is Sidney DeBoer. Formerly the CEO (1968-2011) and the Executive responsible for taking Lithia public in 1996, DeBoer no longer serves in a management role. The current CEO, Bryan DeBoer, is a Member of the Board and reports directly to our Lithia Board of Directors.

14.    Lithia MI's web page advertises that one of those dealerships is Lithia Chrysler Dodge Jeep Ram FIAT of Santa Fe and/or Lithia Chrysler Jeep Dodge of Santa Fe.



15.    At all times relevant to the Complaint, Lithia MI operated Lithia Chrysler Jeep Dodge of Santa Fe through its wholly-owned subsidiary, Lithia CJDSF, Inc. ("Lithia CJDSF"), a New Mexico corporation (business ID 2490399).

16.    Lithia CJDSF was incorporated on August 20, 2004. The company's mailing address is shown as 150 N. Bartlett Street, Medford, OR, and its principal place of business in New Mexico is listed as 4470 Cerrillos Road, Santa Fe, N.M. 87507. The company's officers and directors in New Mexico are listed as including Bryan Deboer, Christopher Holzshu, Edward

---

[5]    Lithia.com.

Impert, and Tina Miller. It registered agent as of March 1, 2016, was and is the National Registered

Agents, Inc., 206 S. Coronado Avenue, Espanola, N.M. 87532.

17.    At all times relevant to the Complaint, Lithia MI and Lithia CJDSF operated with

interrelated operations, all managed and operated by the same group of officers and directors who

operated both companies. Lithia MI maintained centralized control over all aspects of the

operations of Lithia CJDSF in New Mexico, used common management, and had common

ownership and financial control. The control exercised by Lithia MI over Lithia CJDSF decision-

making was virtually absolute such they operated as the alter ego of one another. By way of

example, Bryan DeBoer was the principal officer of both Lithia MI and CJDSF and controlled all

decision-making. Lithia MI listed the Santa Fe dealership on Cerrillos Road on Lithia MI's own

web page as part of its own extensive dealer network without reference to the existence of CJDSF.

The remaining officers and directors of CJDSF as shown on the New Mexico incorporation records

were all Oregon residents employed by Lithia MI. For example, Christopher Holzshu is Lithia

MI's Executive Vice President in Ashland, Oregon; Edward Impert is Lithia MI's Vice President

and General Counsel in Medford, Oregon; and Tina Miller serves as Lithia MI's chief financial

officer and strategic finance leader in Medford, Oregon. Lithia MI's exercise of control over the

operations in New Mexico, and specifically over its subsidiary CJDSF, was to a degree that

exceeded normal input exercised by a parent corporation in that the operations of both were treated

as one as evidenced by the fact that CJDSF did not simply have an officer who reported to Lithia

MI, but rather had the same officer at both companies controlling all decisions for CJDSF, and

Lithia MI and Lithia CJDSF had common officers; common directors; common headquarters;

common advertising; common and/or consolidated financial accounting; shared services;

equipment; office space and the parent (Lithia MI) controlled CJDSF's decisions, payroll decisions, human resources, and benefit programs.

18.    By virtue of its domination of CJDSF, Lithia MI operated Lithia Chrysler Dodge Jeep Ram FIAT of Santa Fe as an automobile sales and service business at 7401 Cerrillos Road, Santa Fe, N.M. 87507, and was responsible for placing the subject defective vehicle into the chain of commerce in 2007.

19.    Between 2004 and 2009, Lithia MI also incorporated Lithia of Santa Fe, Inc. as a business entity (ID #2490381), with named directors including Bryan Deboer, Sidney Deboer, and M.L. Heimann. According to the Secretary of State, the company was voluntarily dissolved on August 11, 2009.

20.    Lithia MI distributed the defective vehicle into the chain of commerce in 2007, and the defective product proximately caused the damages suffered herein.

21.    Defendant Key Safety System's Inc. ("Key Safety") d/b/a Joyson Safety Systems ("Joyson"), is incorporated in Delaware with its principal place of business located at 2025 Harmon Road, Auburn Hills, MI 48326. Joyson is owned jointly by Joyson Group (China) and PAG Capital (Hong Kong), and the company is the result of Key Safety Systems, Inc. purchasing troubled Japanese safety equipment company Takata Corporation ("Takata"). Takata, pursuant to agreements with Defendant FCA, designed and manufactured the defective safety belt in the subject truck. On June 25, 2017, Takata filed for Chapter 11 bankruptcy in the United States and filed for bankruptcy protection in Japan, owing more in compensation than was possible for its survival. On April 11, 2018, the bankrupt assets of Takata were acquired by Key Safety, which then renamed itself to Joyson Safety Systems. Joyson now owns Takata's supplier factories and on information and belief is the successor-in-interest to its core books, records, and personnel.

Defendant Key Safety may be served with process through its registered agent, National Registered Agents, Inc., 40600 Ann Arbor Road E, Suite 201, Plymouth, MI 48170.

22.    Defendant Paige Pyke is a citizen and resident of Albuquerque, N.M., and was the driver of the subject defective Dodge truck at the time of the accident.

23.    Defendant Martin Pyke is a citizen and resident of 7805 Spencer Road NE, Albuquerque, N.M, and was the owner of the subject defective Dodge truck.

## JURISDICTION

24.    New Mexico's Long-Arm Statute permits New Mexico courts to exercise jurisdiction over foreign individuals and companies who, either in person or through agents, submits himself or his personal representative to the jurisdiction of the courts as to any cause of action arising from (a) transacting business within New Mexico; (b) the operation of a motor vehicle on the highways of New Mexico; (c) the commission of a tortious act within New Mexico; or (d) the contracting to insure any person, property, or risk in New Mexico. N.M. Stat. Ann. § 38-1-16.

25.    Service of process is permitted on any such person by personal service outside of New Mexico. N.M. Stat. Ann. § 38-1-16 (B).

26.    The court has personal jurisdiction over Defendants Paige and Martin Pyke because they are residents of New Mexico; operated a motor vehicle on the highways of New Mexico; and committed tortious acts in New Mexico that resulted in the subject crash in New Mexico.

27.    The court has personal jurisdiction over Defendant Lithia and Defendant Lithia CJDSF, Inc., because it is a foreign corporation doing business in New Mexico and thus transacting business in New Mexico; placed the defective vehicle in the stream of commerce in New Mexico;

and entered into a contract in New Mexico, which resulted in the placement of a defective vehicle into the stream of commerce.

28.    The exercise of personal jurisdiction over Defendant FCA satisfies the requirements of New Mexico's long-arm statute because FCA is a foreign corporation doing business in New Mexico and thus transacting business in New Mexico; FCA designed and distributed the subject defective vehicle for sale in New Mexico; FCA either owned or licensed dealerships in New Mexico that targeted citizens of New Mexico for the sale and purchase of Chrysler and Dodge vehicles; FCA entered into contracts in New Mexico, one of which resulted in the placement of a defective vehicle into the stream of commerce; Defendant FCA has sufficient minimum contacts with New Mexico to subject them to suit in New Mexico because FCA had established sufficient contacts to allow the court to exercise specific jurisdiction in that FCA placed products into the stream of commerce with the expectation that their products would be purchased and used in the forum state, including the operation of dealerships in New Mexico using their name, advertising products in New Mexico, and servicing products in New Mexico, all on the part of FCA, to directly or indirectly serve the market in New Mexico. FCA's actions were each purposefully directed at citizens of New Mexico such that FCA reasonably anticipated being brought into a New Mexico court. The claims at issue herein are causally related to FCA's contacts in New Mexico and "lie in the wake" of FCA's activities in New Mexico because FCA regularly sells products in New Mexico, advertises in New Mexico, and services their products in New Mexico. FCA produced and produces New Mexico-targeted advertising and places their Chrysler and Dodge products into the stream of commerce with the intention of selling, maintaining, and repairing them in New Mexico. FCA has been litigants in New Mexico courts, and FCA has systematically engaged in efforts to directly serve the New Mexico market and have sold and

advertised allegedly defective products in New Mexico, including recalls. These facts provide the requisite activity on the part of FCA to satisfy due process. Moreover, although unnecessary to the equation, here, the vehicle and tire involved in the accident were purchased in New Mexico and the accident occurred in New Mexico.

29.    The exercise of personal jurisdiction over Defendant Key Safety satisfies the requirements of New Mexico's long-arm statute because Key Safety is a foreign corporation doing business in New Mexico and thus transacting business in New Mexico; Key Safety designed and distributed the subject defective safety belts for use in vehicles sold in New Mexico; Key Safety had actual and objective knowledge that the products it was supplying, including replacement parts, were being sold and distributed to consumers and to dealerships either owned or licensed in New Mexico that targeted citizens of New Mexico for the sale and purchase of Chrysler and Dodge vehicles; Key Safety entered into contracts for the distribution of its products into New Mexico, one of which resulted in the placement of a defective safety belt into the stream of commerce. Defendant Key Safety has sufficient minimum contacts with New Mexico to subject them to suit in New Mexico because Key Safety had established sufficient contacts to allow the court to exercise specific jurisdiction in that Key Safety placed products into the stream of commerce with the expectation that their products would be purchased and used in the forum state, including activity that surrounded the servicing of dealerships in New Mexico, advertising products to automakers that it knew targeted all states, including New Mexico, and servicing products in New Mexico, all to directly or indirectly serve the market in New Mexico. Key Safety's actions were each purposefully directed at citizens of New Mexico such that Key Safety reasonably anticipated being brought into a New Mexico court. The claims at issue herein are causally related to Key Safety's contacts in New Mexico and "lie in the wake" of Key Safety's activities in New Mexico

because Key Safety regularly sells their products in New Mexico, advertises in New Mexico, and services their products in New Mexico. Key Safety produced and produces advertising aimed at targeting products it knows are aimed at, among other places, New Mexico, and places their safety systems in Chrysler and Dodge products, among others, introduced into the stream of commerce with the intention of selling, maintaining, and repairing them in New Mexico. Key Safety has been litigants in New Mexico courts, and Key Safety has systematically engaged in efforts to directly serve the New Mexico market and have sold and advertised allegedly defective products in New Mexico, including the participation in recall campaigns in New Mexico. These facts provide the requisite activity on the part of Key Safety to satisfy due process. Moreover, although unnecessary to the equation, here, the vehicle and tire involved in the accident were purchased in New Mexico and the accident occurred in New Mexico.

30.    The exercise of personal jurisdiction over Defendant Goodyear satisfies the requirements of New Mexico's long-arm statute because Goodyear is a foreign corporation doing business in New Mexico and thus transacting business in New Mexico; Goodyear designed and distributed the subject defective tire for use in vehicles sold in New Mexico; Goodyear had actual and objective knowledge that the products it was supplying, including replacement tires, were being sold and distributed to consumers and to dealerships either owned or licensed in New Mexico that targeted citizens of New Mexico for the sale and purchase of Chrysler and Dodge vehicles equipped with Goodyear tires; Goodyear entered into contracts for the distribution of its products into New Mexico, one of which resulted in the placement of a defective tire into the stream of commerce. Defendant Goodyear has sufficient minimum contacts with New Mexico to subject them to suit in New Mexico because Goodyear had established sufficient contacts to allow the court to exercise specific jurisdiction in that Goodyear placed products into the stream of

commerce with the expectation that their products would be purchased and used in the forum state, including activity that surrounded the servicing of Goodyear dealerships and tire stores throughout New Mexico, advertising tire products and tire servicing to automakers and citizens that it knew targeted all states, including New Mexico, and servicing products in New Mexico, all to directly or indirectly serve the market in New Mexico. Goodyear's actions were purposefully directed at citizens of New Mexico such that Goodyear reasonably anticipated being brought into a New Mexico court. The claims at issue herein are causally related to Goodyear's contacts in New Mexico and "lie in the wake" of Goodyear's activities in New Mexico because Goodyear regularly sells tire products in New Mexico, advertises tire products in New Mexico, and services tire products in New Mexico. Goodyear produced and produces advertising aimed at targeting tire products it knows are aimed at, among other places, New Mexico, and knowingly places their tire products on Chrysler and Dodge products, among others, introduced into the stream of commerce with the intention of selling, maintaining, and repairing them in New Mexico. Goodyear has been a litigant in New Mexico courts, and Goodyear has systematically engaged in efforts to directly serve the New Mexico market and have sold and advertised allegedly defective products in New Mexico, including the participation in recall campaigns in New Mexico. These facts provide the requisite activity on the part of Goodyear to satisfy due process. Moreover, although unnecessary to the equation, here, the tire involved in the accident was purchased in New Mexico and the accident occurred in New Mexico causing harm to a New Mexico citizen and resident.

## VENUE

31.    Venue is proper in Bernalillo County because Bernalillo County is where Plaintiffs reside.

## FACTUAL BACKGROUND RELEVANT TO ALL CLAIMS

32.    The subject accident occurred on Saturday, June 13, 2020, at approximately 0829, on I-24 near Milepost 129 in Socorro County.

33.    The subject alleged defective vehicle is a 2007 model Dodge Ram 1500 ST/SLT, 4-door extended cab pickup with a 5.7L V8 engine and 4-wheel drive. The VIN code is 1D7HU18227S189449, and the truck was assembled at Defendant FCA's Warren assembly plant in 2006 or early 2007.

34.    According to publicly available information, the first owner of the subject Truck was Lithia Chrysler Dodge Jeep Ram FIAT of Santa Fe, who acquired it on March 12 2007.

| | |
|---|---|
| 03/12/2007 | Lithia Chrysler Dodge Jeep Ram FIAT of Santa Fe<br>Santa Fe, NM<br>505-473-1234<br>lithiasantafe.com |

35.    Later in 2007, Defendant Martin Pyke purchased the subject Dodge truck from Viva Motors in Socorro, N.M. When Defendant Pyke purchased the truck, the original equipment rims and tires were on the truck.

36.    In either 2014 or 2015, Defendant Pyke purchased a set of replacement tires for the subject truck. Upon information or belief, the replacement tires were purchased at Discount Tire in Albuequerque.

37.    Defendant FCA's responsibility flows from Chrysler/Dodge's history.

38.    In 1987, Chrysler Corporation merged with American Motors Corporation ("AMC").

39.    In 1998, Chrysler Corporation and its subsidiaries entered into a partnership dubbed a "merger of equals" with German-based Daimler-Benz AG, creating the combined

entity DaimlerChrysler AG. Under DaimlerChrysler, the company was named DaimlerChrysler Motors Company LLC, with its U.S. operations generally referred to as "DCX".

40.     In 2007, DaimlerChrysler announced the sale of 80.1% of Chrysler Group to American private equity firm Cerberus Capital Management, L.P., thereafter known as Chrysler LLC.

41.     In 2009, Chrysler LLC, later known as "Old Carco LLC", filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code.

42.     In April, 2009, Old Carco and Fiat S.p.A. entered into a "Master Transaction Agreement" ("MTA"), pursuant to which New Carco Acquisition LLC, an entity formed by Fiat and referred to as Chrysler Group LLC (CG-LLC), agreed to purchase the principal operating assets of Old Carco and to assume certain of Old Carco's liabilities.

43.     Following execution of the MTA, litigation was initiated challenging the provisions of the MTA that effectively attempted to insulate new entity from Product Liability Claims arising from incidents involving the bankrupt's pre-bankruptcy (pre-2009) inventory where the sale of the vehicle occurred pre-bankruptcy.

44.     On October 29, 2009, during the pendency of the referenced litigation, the parties to the acquisition agreed to amend the Plan so that the purchaser of the assets would now assume, rather than disclaim, non-time-barred Product Liability Claims that "arise from the sale on or prior to the Closing based on accidents that occurred on or after Closing, including negligence claims. The aforementioned sale closed on June 10, 2009, thus making CG-LLC responsible for defects in the subject vehicle.

45.     On November 19, 2009, a stipulation and agreed order approving Amendment No. 4 to the MTA was approved and filed. The Amendment represented the assumption of responsibility for pre-bankruptcy (pre-2009 model) vehicles involved in post-bankruptcy crashes, including CG-LLC's assumption of responsibility for defects in the subject vehicle.

46.     Defendant FCA, then known as Chrysler Group LLC, acquired the principal operating assets of the former Chrysler LLC in 2009 as part of a government-sponsored restructuring of the North American automotive industry.

47.     Between 2009 and 2014, Fiat S.p.A. completed a corporate reorganization resulting in the establishment of FCA NV as the parent company of the FCA Group, with its principal executive offices in the United Kingdom. As a result, FCA NV, as successor of Fiat S.p.A., became the parent company of the FCA Group.

48.     In 2014, Fiat Chrysler Automobiles N.V. was incorporated as a public limited liability company under the laws of the Netherlands and became the parent company of Defendant FCA.

49.     In 2019, Defendant FCA and Peugeot S.A. ("PSA") entered into a combination agreement providing for a merger of their businesses. The formal merger occurred in 2021, and the combined company was renamed Stellantis N.V.

50.     The Ram pickup (marketed as the Dodge Ram until 2010) is a full-size pickup truck manufactured by Defendant FCA and marketed from 2010 onwards under the Ram Trucks brand.

51.     Ram was part of the Dodge line of light trucks. The name *Ram* was first used in 1981 model year Dodge Trucks, and resulted from the retiring and rebadging of the Dodge D series pickup trucks as well as B-series vans.

52.    The first-generation Ram truck was introduced in October 1980.

53.    In 1998, Dodge introduced the 4-door Quad Cab, which was the first extended cab pickup to have four doors.

54.    Although Dodge introduced a new Ram 1500 version for 2002, the old second-generation style Ram was carried over for the 2002 model year heavy-duty 2500 and 3500 trucks. The new third-generation Ram would not appear in the 2500/3500 variants until 2003.

55.    The third-generation Ram was introduced in 2001 as a 2002 model on 1500 models and 2003 on 2500 and 3500 models. This generation featured an all-new frame, suspension, powertrain, interior, and sheet metal. The crew cab versions were actually Quad Cab trucks that had conventional-opening rear doors. The four-wheel-drive light trucks (1500 series) lost their live axles in favor of an independent front suspension, but the 2500 and 3500 series retained the live axles for maximum longevity and durability; rear-wheel-drive 2500 & 3500 had class-exclusive rack and pinion steering for their independent front suspension (the 1500 also received rack and pinion steering for the first time).

56.    The Ram was updated for the 2006 model year, but only to include appearance in most versions.



2006-2008 Dodge Ram

57.    The fourth generation Dodge Ram was introduced in 2008 as the 2009 Dodge Ram 1500. In 2010, the Ram Trucks brand was separated from Dodge.

58.     The subject Dodge truck was placed into the stream of commerce by the Lithia defendants in 2007. Upon information and belief, the Lithia Defendants worked jointly with another dealership to sell the truck to Defendant Martin Pyke.

59.     The subject Dodge truck was owned by Defendant Martin Pyke at the time of the accident.

60.     The subject Dodge truck was being operated by Defendant Paige Pyke at the time of the accident.

61.     Plaintiff Romeo Magana was a right front seat, belted occupant in the subject truck at the time of the accident.

62.     On the date in question, Defendant Paige Pyke was driving the subject Dodge pickup at approximately 80-82 mph southbound on I-25 in the passing lane when witnesses observed the right rear tire suffer a catastrophic failure. The tire failure immediately resulted uncontrollable movement of the truck and loss of control. During the sequence, the subject Dodge rolled over multiple times.



SUBJECT TRUCK

63.    During the rollover, Plaintiff Romeo Magana was ejected from the vehicle and was found on the ground within 10 yards of the final rest position of the truck. The hospital record reflects:

Final

Assessment and Plan:
This is a 20 year old male no PMH who was the restrained passenger in a rollover MVC on 6/13.

Page 4 of 736

64.    At the time of the accident, Plaintiff Romeo Magana was 20-years old and the son of Victoria and Edward Magana. He was a graduate of Cibola High School and a student at Central New Mexico Community College preparing to transfer to UNM.

65.    The subject truck was equipped with a three-point continuous loop safety belt system in the right front position. The system included an ABO 7005 X 1 buckle that was designed and manufactured by Takata Corporation ("Takata").

66.    Defendant Key Safety d/b/a Joyson Safety Systems (previously defined as "Joyson"), is the successor-in-interest to Takata.

67.    The subject defective buckle was designed in the mid-1990s by Takata as an end-release buckle.

68.    One of the key requirements of buckle design is to ensure that the buckle cannot be inadvertently opened – or caused to be opened – by inadvertent contact with a flailing limb or body part, such as an elbow.

69.    For decades now field research and laboratory testing has consistently demonstrated that wearing a seat belt dramatically reduces the risk of occupant death or serious injury in motor vehicle crashes.

70.    Federal Motor Vehicle Safety Standards require that buckles be readily accessible to the occupant and requires that the release mechanism shall be designed to minimize the

possibility of accidental release. The minimum pushbutton size is specified to be 452 mm (0.7 square inch), with a minimum linear dimension of 10 mm (0.4 inch).

71.     The federal government has stated that the objective criteria to evaluate "accidental release" are established by the requirement that the buckle be subjected to a compressive force of 1,779 N (400 lbf) using the test procedure in the requirement, and that this was created to "eliminate buckle designs that are prone to accidental damage, or that release during the initial phase of the accident" through impact with the components or other compressive contacts thus preventing unwanted buckle release due to compressive forces being exerted on the buckle cover.

72.     It is the responsibility of the manufacturer to determine whether or not their products fall within the standard's provisions.

73.     The European Union ("EU") also regulates safety belts and restraint systems in motor vehicles. Regulation 16 ("ECE R16"), which is also utilized by non-European members, includes a "ball test" utilizing a 40-mm diameter ball to classify a buckle as either "enclosed" or "non-enclosed" (or recessed/non-recessed). The "ball test" evaluation is performed by a witness from a certifying agency as part of the seat belt component certification.

74.     The EU directive also includes the requirement that "The device for releasing the buckle shall be ... so designed that it cannot be opened inadvertently or accidentally."

75.     Ultimately, the supplier of the buckle must balance the possibility of release by inadvertent contact and thus the need to consider not only buckle design, but also the vehicle environment in which a buckle is intended to be used.

76.     Takata had actual knowledge – as reflected in a patent -- as early as 1994 that one of the key objectives of a buckle design is prevent the release of the buckle inadvertently. As a consequence, Takata created an internal 30mm (1.18" diameter) ball test requirement.

77.    The AB buckle failed to meet the test requirement.

78.    The right rear tire at the time of the accident was a Goodyear Wrangler HP P275/60R20 tire with a DOT code of MGYNF01R5013.

79.    The Goodyear Wrangler HP is a commercial line or family of radial tires that Goodyear advertises as highway tires "trusted for original equipment" use on truck sand SUVs. The tires are marketed as all-season traction and performance and handling.



80.    A radial tire is a composite structure consisting of six major components. Each of these primary components is engineered to serve specific functions in the tire.

81.    One of the critical structures is the inner liner, which is a unique rubber compound that acts as the tire's inner tube and helps to retain the air in the tire.

82.    Another structure is the body plies, which give the tire the strength and structure necessary to retain the air pressure to carry specified loads.

83.    Yet another is the steel belts, which are a composite of steel cords and a rubber compound that provide additional strength and stability in the tread area.

84.    The tread, which consists of specially formulated rubber compound and specially designed tread element geometry, exists to provide wet and dry traction, treadwear, rolling resistance, and ride and handling characteristics.

85.    Rubber sidewalls protect the internal structure against minor cuts and abrasions and provide aesthetic appearance to the tire.

86.    The method for making a tire at Goodyear is called a "tire specification".

87.    The alleged defect in the subject tire involves a belt-leaving-belt failure of a tire (often referred to as "tread separation"), resulting in complete or partial detachment of the tread and the outer belt (also referred to as the top belt or the second belt) from the tire's carcass and inner belt (also referred to as the lower belt or first belt).

88.    Elevated and extended heat generation is a primary factor in the breakdown of tire components leading to separation failure.

89.    Increased heat decreases rubber tear resistance which promotes crack initiation and propagation.

90.    Permanent degradation of material properties of tires occurs as well from exposure to elevated temperatures.

91.    Tire rotation affects the centrifugal force and deflection cycle, and corresponding changes in the stresses and strains of the tire affect heat build-up characteristics of the design.

92.    It is well-known that fatigue and separation are associated with tire endurance and both can be harmed by excessive conditions of load, deflection, inflation and speed.

93.    Tires are normally designed and developed to withstand an equilibrium internal temperature. When that temperature is exceeded for long periods of time the tire begins to lose strength in material components and will eventually suffer from separations within the structure.

94.    Tire manufacturers know to monitor developing internal temperatures in high speed testing to ensure the design is operating safely.

95.    It is a well-accepted principle throughout the tire industry that the fatigue life of a reasonably safe tire design should exceed its tread life by some design/safety margin for reasonably foreseeable service conditions.

96.    Detachment of the tread and second belt from the carcass significantly alters the lateral stiffness and other properties of the tire, with a consequent reduction in vehicle stability, which can, and does, lead to crashes, injuries, and fatalities.

97.    Belt-leaving-belt tread separations, whether or not accompanied by a loss of air from the tire, reduce the ability of a driver to control the vehicle, particularly when the failure occurs at high speeds. Such a loss of control can lead to a crash. The likelihood of a crash, and of injuries or fatalities from such a crash, is far greater when the tread separation occurs on a SUV or compact pickup.

98.    One critical design feature used by tire manufacturers to suppress the initiation and growth of belt edge cracks is the "belt wedge," which is a strip of rubber located between the two belts near the belt edges on each side of the tire.

99.    Another important feature of radial tires related to the prevention of belt-leaving-belt separations is the gauge of the rubber between the two steel belts, or "inter-belt gauge."

100.    Another design feature used to prevent a tread separation is a nylon overlay or nylon cap ply, which is a layer of rubberized parallel nylon cords wrapped circumferentially over the top of steel belts and under the tread. They are designed to prevent or reduce the risk of catastrophic tread and belt detachments.



101.    With regard to tire service life, between 1990 and 2000, various European car manufacturers (e.g., Toyota, BMW, Audi, VW) began making recommendations in Owner's Manuals that tires be replaced after 6-10 years from their date of manufacture.

102.    During the same time frame (1995-1999), internal records at Firestone recognized the significance of the relationship between aging and belt edge separations, including that Firestone described as a "significant" problem in the market with aging of tires.

103.    The Ford Explorer/Firestone tire global disaster resulted in a recall in 2000 that focused further attention on this problem of tire aging in the field and resulting failures.

104.    By 2001, the UK RMA issued a recommendation that tires be removed from service when they were over 6-years of age.

105.    By 2003, the RMA in the U.S.A. issued a recommendation that tires over 10-years of age be removed from service by tire companies and tire dealers.

106.    By 2004, Michelin joined in the recommendation, choosing a 6-year recommendation. Japan's Association joined that same year, but with a 10-year limit recommendation for professionals.

107.    In 2005, Ford and Chrysler joined with each recommending to their stores and dealers to replace any tire after 6-years of age.

108.    By 2006, Firestone issued a recommendation to service centers to remove all tires after 4-years.

109.    In 2010, Goodyear issued a Product Service Bulletin to Goodyear Contract Dealers advising them that "various automobile and tire manufacturers have (issued) statements regarding tire service life" based on chronological age, but that Goodyear Contract Dealers should not consider any such recommendation as a minimum. In issuing the statement, Goodyear claimed

that as of 2010, "all known scientific or technical data indicate that a specific minimum or maximum service life" cannot be objectively established."

110.    The subject failed tire was manufactured in 2013. The subject accident and tire failure occurred in 2020. At the time of the accident, the subject tire was 7-years old.

**COUNT I**
**STRICT LIABILITY – DEFECTIVE VEHICLE**
**Defendants FCA, Lithia, and Key Safety**

111.    The Plaintiffs incorporate paragraphs 1-92 as if each was reproduced.

112.    At all times relevant to the Complaint, Defendant FCA was in the business of designing, assembling, manufacturing, testing, marketing, and distributing vehicles for sale into the stream of commerce.

113.    At all times relevant to the Complaint, Defendant Lithia was in the business of selling, distributing, and servicing vehicles for sale into the stream of commerce.

114.    At all times relevant to the Complaint, Defendant Key Safety was in the business of designing, assembling, manufacturing, testing, marketing, and distributing seatbelts for assembly and distribution in vehicles placed into the stream of commerce.

115.    The subject Dodge truck was designed, assembled, manufactured, tested, marketed and distributed by Defendants FCA and Lithia in a defective and unreasonably dangerous condition.

116.    The subject truck was in substantially the same condition at the time of the crash as it was when manufactured and distributed.

117.    The subject truck was being used in a reasonable and foreseeable manner for the purposes for which it was marketed.

118.    The subject Dodge truck seatbelt system for the front outboard occupant was designed, assembled, manufactured, tested, marketed and distributed by Defendants FCA, Lithia, and Key Safety in a defective and unreasonably dangerous condition.

119.    The defects existed at the time of manufacture and distribution.

120.    The subject Dodge truck was in a defective condition due to its handling, stability, and crashworthiness characteristics.

121.    Due to the defects, the subject Dodge truck lost stability and was rendered unstable and uncontrollable, resulting in the crash, and the safety belt system failed to function safely, as expected by a reasonable consumer, and as represented, and also failed to provide a reasonable degree of crash protection.

122.    The defective nature of the subject Dodge truck was a proximate cause of the accident, injuries and damages suffered by Plaintiffs.

123.    Defendants FCA, Lithia, and Key Safety are strictly liable for the defective truck that caused Plaintiffs' harms and injury.

## COUNT II
## STRICT LIABILITY – DEFECTIVE TIRE
### Defendants Goodyear

124.    The Plaintiffs incorporate paragraphs 1-92 as if each was reproduced.

125.    At all times relevant to the Complaint, Defendant Goodyear was in the business of designing, assembling, manufacturing, testing, marketing, and distributing tires for assembly and distribution on vehicles placed into the stream of commerce.

126.    The subject Dodge truck was designed, assembled, manufactured, tested, marketed and distributed by Defendants Goodyear in a defective and unreasonably dangerous condition due to the defective tire.

127.    The subject truck and tire were in substantially the same condition at the time of the crash as they were when manufactured, installed, and distributed.

128.    The subject truck and tire were being used in a reasonable and foreseeable manner for the purposes for which they were each marketed.

129.    The subject Goodyear tire was designed, assembled, manufactured, tested, marketed and distributed by Goodyear in a defective and unreasonably dangerous condition, and it was installed on the truck and then distributed in a defective condition.

130.    The defects in the tire and truck existed at the time of manufacture and distribution, but were hidden defect not readily observable.

131.    The defective tire rendered the subject Dodge truck defective and the combination of defects led to the crash.

132.    Due to the defects in the tire, the subject Dodge truck lost stability and was rendered unstable and uncontrollable, resulting in the crash, and the safety belt system failed to function safely, as expected by a reasonable consumer, and as represented, and also failed to provide a reasonable degree of crash protection.

133.    The defective nature of the subject tire and Dodge truck was a proximate cause of the accident, injuries and damages suffered by Plaintiffs.

134.    Defendant Goodyear is strictly liable for the defective tire and truck that caused Plaintiffs' harms and injury.


### COUNT III
### NEGLIGENCE
**Defendant FCA**

135.    The Plaintiffs incorporate paragraphs 1-92 as if each was reproduced.

136.    At all times relevant to the Complaint, Defendant FCA was in the business of designing, assembling, manufacturing, testing, marketing, and distributing vehicles for sale into the stream of commerce, each equipped with safety belts and tires, and had a legal duty to use reasonable care at each step of the way, including after distribution of the product.

137.    Defendant FCA was negligent when it designed, assembled, manufactured, tested, marketed and distributed the subject truck and safety belt in a defective and unreasonably dangerous condition thus unnecessarily exposing others to harm.

138.    Defendant FCA's negligence included negligent design; testing; marketing; specifications; manufacturing; and warnings, including pre-sale and post-sale.

139.    Defendant FCA's negligence was a proximate cause of the accident, injuries and damages suffered by Plaintiffs, including enhanced injuries.

**COUNT IV**
**NEGLIGENCE**
**Defendant Goodyear**

140.    The Plaintiffs incorporate paragraphs 1-92 as if each was reproduced.

141.    At all times relevant to the Complaint, Defendant Goodyear was in the business of designing, assembling, manufacturing, testing, marketing, and distributing tires for sale into the stream of commerce, and had a legal duty to use reasonable care at each step of the way, including after distribution of the product.

142.    Defendant Goodyear was negligent when it designed, assembled, manufactured, tested, marketed and distributed the subject tire in a defective and unreasonably dangerous condition thus unnecessarily exposing others to harm.

143.    Defendant Goodyear's negligence included negligent design; testing; marketing; specifications; manufacturing; warnings; and the negligent failure to warn of the dangers of tire aging or service life, including pre-sale and post-sale.

144.    Defendant Goodyear's negligence was a proximate cause of the accident, injuries and damages suffered by Plaintiffs, including enhanced injuries.

## COUNT V
## NEGLIGENCE
### Defendant Lithia

145.    The Plaintiffs incorporate paragraphs 1-92 as if each was reproduced.

146.    At all times relevant to the Complaint, Defendant Lithia was in the business of preparing, inspecting, marketing, and distributing vehicles with tires for sale into the stream of commerce, and had a legal duty to use reasonable care at each step of the way, including after distribution of the product.

147.    Defendant Lithia was negligent when it marketed and distributed the subject vehicle in a defective and unreasonably dangerous condition thus unnecessarily exposing others to harm.

148.    Defendant Lithia's negligence included negligent distribution of a defective product and negligent failure to warn of the dangers of the defective vehicle.

149.    Defendant Lithia's negligence was a proximate cause of the accident, injuries and damages suffered by Plaintiffs, including enhanced injuries.

## COUNT VI
## NEGLIGENCE
### Defendants Paige and Martin Pyke

150.    The Plaintiffs incorporate paragraphs 1-86 as if each was reproduced.

151.    At all times relevant to the Complaint, Defendants Paige and Martin Pyke were the owner and/or operator of the subject truck on the highways of New Mexico and had a legal duty to do so using reasonable care.

152.    Defendants Paige and Martin Pyke were negligent in the care of and the subject truck; negligent in the operation of the subject truck; negligent in exceeding the speed limit; negligent in failing to observe the safe rules of the roadway; and negligent in failing to inspect and maintain their tires.

153.    Defendants Paige and Martin Pyke's negligence was a proximate cause of the accident, injuries and damages suffered by Plaintiffs, including enhanced injuries.

**COUNT VII**
**CLAIM FOR PUNITIVE DAMAGES**
**FCA and GOODYEAR**

154.    At all times relevant to the Complaint, Defendants FCA and Goodyear knew of facts or intentionally disregarded facts that created a high probability of injury to Plaintiffs. Defendants FCA and Goodyear deliberately acted in conscious or intentional disregard of the high probability of injury to consumers like Plaintiffs and/or deliberately acted with indifference to the high probability of injury to them and other users of the trucks and tires. FCA and Goodyear are guilty of malice as defined by New Mexico law, and each should be punished and made an example of to discourage each and others from engaging in like conduct, through an assessment of punitive damages.

155.    Defendant FCA's conduct warranting punitive damages is only focused on its post-bankruptcy sale knowledge of facts that should have led to warnings or service-related action that would have prevented the accident, and is not focused on action taken pre-bankruptcy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against each of the Defendants, jointly and

severally where applicable, for all damages allowed by law, together with costs of suit and for all

such other and further relief to which Plaintiffs may be justly entitled, including:

a.   Past and future health care expenses;
b.   Past and future lost earnings and earning capacity;
c.   Past and future pain and suffering;
d.   Past and future mental and emotional suffering;
e.   Lost services;
f.   Alteration of established course of life;
g.   Loss of enjoyment of life;
h.   Purchases necessitated;
i.   Loss of consortium;
j.   Costs of suit;
k.   Pre-judgment and post-judgment interest as provided by law; and
l.   Such other and further relief both general and special, at law and in equity,
     to which Plaintiffs may be justly entitled and the Court deems appropriate.

And, WHEREFORE, Plaintiffs demand judgment against Defendants FCA and Goodyear

for punitive damages in a sufficient amount to discourage each of them and others from engaging

in like conduct in the future.

DATED this 20th day of July, 2023.

Respectfully submitted by:

VALLE, O'CLEIREACHAIN,
ZAMORA & HARRIS

/s/ Matthew Zamora
Matthew Zamora
1805 Rio Grande Blvd. NW, Suite 2
Albuquerque, NM 87104
PH: (505) 888-4357
Email: mz@vozhlaw.com

AND

TURNER & ASSOCIATES, P.A.

C. Tab Turner
4705 Somes Ave., Suite 100
North Little Rock, AR 72116
PH: (501) 791-2277
Email: tab@tturner.com

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

ROMEO MAGANA, VICTORIA MAGANA,
and EDWARD MAGANA,

      Plaintiffs,

v.                                           No.

THE GOODYEAR TIRE & RUBBER COMPANY;
FCA US LLC;
KEY SAFETY SYSTEMS, INC.;
LITHIA MOTORS, INC. d/b/a LITHIA CHRYSLER
DODGE JEEP RAM FIAT OF SANTA FE;
LITHIA CJDSF, INC.;
PAIGE PYKE, and MARTIN PYKE,

      Defendants.

### COURT-ANNEXED ARBITRATION CERTIFICATION

**COMES NOW** the Plaintiffs, Romeo Magana, Victoria Magana and Edward Magana, appearing by and through counsel of record, **VALLE, O'CLEIREACHAIN, ZAMORA & HARRIS** (Matthew J. Zamora), and pursuant to LR2-603, certify that they are seeking relief in excess of Fifty Thousand Dollars ($50,000.00) exclusive of interest, costs and attorneys' fees, and that therefore, this case is not subject to court-annexed arbitration.

                             Respectfully submitted,

                             **VALLE, O'CLEIREACHAIN,**
                             **ZAMORA & HARRIS**
                             */s/ Matthew J. Zamora*
                             Matthew J. Zamora, Esq.
                             Attorney for Plaintiff
                             1805 Rio Grande Blvd., NW, Suite 2
                             Albuquerque, NM 87104
                             PH:   505-888-4357
                             Email: mz@vozhlaw.com

                             AND

                             **TURNER & ASSOCIATES, P.A.**
                             C. Tab Turner
                             4705 Somes Ave., Suite 100
                             North Little Rock, AR 72116
                             PH: (501) 791-2277
                             Email: tab@tturner.com